UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -9 P 4: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

INTERNATIONAL STRATEGIES GROUP, LTD.
   Plaintiff

     v.

STEPHEN C. HEFFERNAN
   Defendant

CIVIL ACTION NO.
04-CV-10863-RWZ

## OPPOSITION TO DEFENDANT
## STEPHEN C. HEFFERNAN'S MOTION TO DISMISS

Plaintiff International Strategies Group, Ltd. ("ISG") submits this memorandum in opposition to the Motion to Dismiss filed by defendant Stephen C. Heffernan ("Heffernan"). Heffernan's argument is in two parts: (1) ISG's claims are time barred and (2) the claims for breach of fiduciary duty and fraud fail to state a claim upon which relief can be granted.

As to the statute of limitations argument, ISG states that its causes of action against Heffernan did not accrue until 2001, and that it timely filed this lawsuit. While it is true, as Heffernan points out, that by 1999 ISG knew that Corporation of the BankHouse, Inc. ("COB") had transferred ISG's funds to Swan Trust, ISG did not know or have reason to know that COB had engaged in fraud until 2001, as COB, its senior executives and its lawyers engaged in an extensive pattern of cover-up, delay and misrepresentations as to the legalities of COB's actions. Discovery of the fraud on the part of senior officers, such as Heffernan, occurred even later. In order to explain the cover-up and delay, ISG makes the following offer of proof. The offer of proof is supported by extensive documentation and the affidavit of Philip Clark. Most of the facts

were presented already in Civil Action No. 02-10532-RWZ. A court may take judicial notice of the court's records in a related case. Jarosz v. Palmer, 436 Mass. 526, 2002 Mass. Lexis 207 (2002). Also, ISG need not have pleaded all facts relevant to the statute of limitations defense in its complaint. The defense is an affirmative one and a plaintiff is not required to anticipate it, or plead the relevant facts in the complaint. Quinton v. Gavin, 2001 Mass. Super. Lexis 402 (2001), *citing* Fowles v. Lingos, 30 Mass. App. Ct. 435, 438, 569 N.E. 2d. 416 (1991).

## FACTS

**I.**    *Facts pertaining to time for bringing claims*

**A.**    *ISG's initial investment*

In April 1998 ISG gave $4 million to Corporation of the BankHouse, Inc. ("COB") to invest. At that time, Heffernan was the treasurer of COB and acted as its chief financial officer.[1] In his capacity as treasurer, Heffernan played a pivotal role in establishing the bank account into which ISG's funds were deposited, and from which they were removed.

ISG's investment was made based on a non-depletion guaranty which assured ISG that its funds would not be reduced below $4 million, and would earn a profit by being taken out of circulation as part of a program sponsored by the Federal Reserve Bank. Other investors in this supposed program were Danstrupland and P.R.C.S., an affiliate of Royal Phillips Electronics, both large and well established European entities.

---

[1] Heffernan also was an executive in other entities under the control of James F. Pomeroy. He was treasurer of China Enterprise Management Corporation, and later became a director of that corporation. He was vice president of BankHouse International Management Corporation. When SB Global, Inc. was incorporated in 2000, Heffernan was treasurer.

2

ISG's money was to be held in an account at Abn Amro Bank in Brussels, Belgium. Heffernan received instructions from Albert Pans, COB's Vice President for European Affairs who met with ISG's representative in Brussels, on the corporate resolution necessary for setting up a sub-account to COB's master account. (ISG 435-36).[2] Heffernan followed those instructions by having the corporate secretary prepare a certificate with the language just as Pans had requested (ISG 345). On May 15, 1998 Pans faxed Heffernan a "capacity statement" showing $14 million on account with Abn Amro in Brussels (ISG 432). Pans also provided Heffernan with details on the Abn Amro accounts for ISG and other investors (ISG 438). All of this was in keeping with Heffernan's role of treasurer and chief financial officer of COB and co-signatory to all COB accounts, and all was unknown to ISG.

**B.** *Depletion of ISG's syndicate account*

In May 1998 COB asked ISG to consent to a transfer of funds from ISG's sub-account to COB's master account. COB promised ISG that this was simply an internal movement of funds, and it would not affect COB's earlier undertakings. (ISG 430). On May 29, 1998, in reliance on this assurance from COB, together with the fact that documents were executed by Pomeroy and copied to Heffernan, ISG implemented the transfer of $4 million from its syndicate sub-account to the COB master account.

---

[2] Documents labeled as "ISG ___ " were produced in discovery by defendants in the civil action International Strategies Group, Ltd. v. Corporation of the BankHouse, Inc., et al, 02-10532-RWZ. By way of requests for admissions, all were admitted to be true and accurate copies of the originals and admissible as duplicates. All documents referred to herein have been provided to defendant's counsel, but because of the volume have not been filed with this opposition.

Heffernan knew that Pans, on behalf of COB, had assured ISG that its funds would not be depleted, as Pans sent Heffernan a copy of his confirming letter to ISG (ISG 430). On the same day that ISG's $4 million was transferred to COB's master account, $821,500 was transferred to COB's lawyers at Eckert, Seamans, Cherin & Mellot, and $328,500 was transferred to a COB account at Fleet Bank. There were other transfers as well. ISG did not know about these transfers and did not consent to them. In fact, they were completely at odds with the promises made to ISG that its funds would not be depleted. Heffernan did not disclose the discrepancies to ISG.

### C.    *The cover-up begins*

Thereafter, ISG asked COB to produce the written bank guaranty of non-depletion, and expressed concern over COB's failure to do so. On August 12, 998 COB responded to ISG, falsely stating that ISG profits were already $2 million. (ISG 185). Again in October 1998 COB confirmed that there was a total of $6 million in notes and guarantees. (ISG 046). On or about October 16, 1998 Heffernan spoke to Philip Clark, ISG's representative, about wiring what was said to be "profit" to ISG's account, and Clark followed up by faxing the wiring instructions (ISG 047). The transfer was in fact made to ISG's account. Heffernan led Clark into believing that the wired funds were ISG's profit, even though there was no $2 million in profit as COB had earlier represented to be the case.

In November 1998 Clark traveled to Boston to meet with Pomeroy and other senior executives of COB. At the meeting, Pomeroy assured Clark that ISG's funds were intact, and requested that ISG agree to have its funds transferred to an account at Fleet

Bank to be established with Clark as a signatory. Clark agreed that ISG's funds could be transferred to Fleet Bank upon the condition that they would be held in a new account for that syndicate, and would remain intact and not be depleted. Clark also insisted that the account require two signatures, Clark's and Heffernan's. Upon assurances that this would be the case, Clark executed signature cards and account opening forms for Fleet Bank.

When Clark signed the forms, Heffernan knew that he was and would remain sole signatory, on the account, as he never delivered Clark's signature cards to the bank. Moreover, the only funds ever deposited into this account were a small opening figure of $50. Heffernan failed to disclose the true state of affairs, and allowed ISG to rely on the series of misrepresentations.

### D.   *The transfer to Swan Trust*

Also in or about October or November 1998 Heffernan and Pomeroy began dealing with Swan Trust and its trustee, Henry Pearlberg. On or about November 4, 1998, Heffernan and Pomeroy transferred a total of $19 million to a Swan Trust account at Bank of New York (Ex. 21, 22, 44)[3]. Of that total, $4 million from another syndicate was allocated to ISG, effectively replacing ISG's funds with those of another. Heffernan

---

[3] "Ex. ___" refers to a set of documents obtained in discovery from COB and Pomeroy. Their genuineness and admissibility were established, like the "ISG __" documents, through requests for admissions in Civil Action No. 02-10532-RWZ.

signed the transfer orders, and confirmed to Henry Pearlberg that $19 million had been sent to him. (Heffernan Depo. Ex. 30, 31 a-c ). At the time, ISG had no knowledge of Swan Trust or Henry Pearlberg, and no knowledge that its funds had been depleted or replaced.

Pomeroy, seeking to portray to Clark and ISG that its funds were intact, showed Clark account statements for an account at Fleet called Syndicate 174A in which $4 million had been placed. It was from this 174A account that Heffernan (who was a joint signatory, but not with Clark) transferred the $4 million along with two other transfers ($5 million from P.R.C.S. and $10 million from Danstrupland) from the remaining genuine Fleet accounts to Swan Trust. The total amount transferred was $19 million, a sum portrayed to Clark as being the entire syndicates' intact capital.

Heffernan knew that ISG believed its principal was intact, along with substantial profits. He also knew that ISG was unaware of the "replacement" or transfer to Swan Trust, but he nonetheless failed to disclose the true state of affairs and allowed ISG to remain ignorant of the facts and to rely on misrepresentations.

### E.     *The cover-up continues*

On November 11, 1998, ISG wrote to Barbara Kravitz, corporate secretary of COB, asking for confirmation that the steps agreed to in Clark's meeting at COB's offices had been carried out, *i.e.* that $4 million had been transferred from COB's master account at Abn Amro in Brussels to Fleet Bank in Massachusetts (ISG 044). COB senior executives conferred, and Heffernan volunteered to respond to ISG's letter per Pomeroy's instructions. (ISG 044). Heffernan wrote to ISG, promising that the information ISG

required would be compiled and provided expeditiously (ISG 297). Heffernan did not do that, and instead withheld further information from ISG. As a result of Heffernan's failure to provide the information he had promised, ISG remained in the dark about the true state of affairs, and continued to rely on misrepresentations.

**F.    *ISG learns of the transfer to Swan Trust and assignment from Swan Trust***

By February 1999 ISG had learned that its funds were not in the hands of COB, and had been transferred to Swan Trust. When first describing the deal with Swan Trust, Pomeroy described it as a favorable investment opportunity, promising even greater rewards than available through COB's other investment vehicles.

Later, after ISG pressed for return of its money, Pomeroy told ISG that he was working to get the funds, plus profit, back from Swan Trust. Even then, however, Pomeroy assured ISG that the accounts in which ISG's funds were held exceeded $100 million, and that ISG's profits would be sizeable. (ISG 249). Pomeroy also assured ISG that $46 million of profit was to be distributed among ISG and the two other investors.

In April 1999 Pomeroy told ISG that Swan Trust had executed a Deed of Assignment transferring bank accounts and other assets to Pomeroy for distribution to investors and that he expected to have $65 million of principal and profit for investors. (ISG 010, 012, 015, 1211). On May 5, 1999 Pomeroy told ISG that it remained his opinion that "we are not and should not become adversarial with Swan, nor the bank group nor commitment holder until we are paid out." (ISG 008). ISG did not know it at

the time, but this was a theme that Pomeroy's lawyer John Pappalardo would later adopt as his own mantra so as to dissuade ISG from taking its own action.

At about the same time that Pomeroy was telling ISG that substantial funds would be distributed to investors, Pomeroy told COB employees that Heffernan would talk to them about a special distribution of $400,000 that each would soon receive. (Kravitz Depo. Ex. 16).

On or about July 26, 1999, Abn Amro transferred $1,215,000 to Pomeroy pursuant to the Deed of Assignment from Swan Trust. ISG knew about the transfer, and asked Pomeroy how much would be allocated to ISG. Pomeroy responded by saying that he would not commit to a distribution formula and that the transfer would be used for everyone's benefit. (ISG 190)  Pomeroy also told his lawyer Stephen Burr, at Greenburg Traurig that he had received the money.

By this time, Pomeroy was hiding behind his lawyers and refusing to be forthcoming to the investors.  Heffernan knew this because he, as a senior executive, received instructions from Pomeroy on the role he should play while Pomeroy was out of the office.  (Kravitz Depo. Ex. 19).  Heffernan did nothing to inform ISG of the facts, or to alert it to protect its investment.  He allowed ISG to remain in the dark and to rely on misrepresentations.

### G.    *COB's lawyers become involved to induce ISG's forbearance.*

Pomeroy continued assuring ISG that the funds would be returned from Swan Trust (Ex. 34, 35, 36).  On August 12, 1999, Stephen Burr of Greenberg Traurig, LLP, sent a demand letter to Swan Trust and another intermediary, May Davis Group. (Ex. 37).

Beginning in August 1999 John Pappalardo, then of Eckert, Seamans, Cherin & Mellott, met with Clark. Pappalardo assured Clark that he would protect the interest of all the investors, including ISG (ISG 957-58), and asked for ISG's forbearance while Pappalardo tried to recover the funds. This marked the beginning of a two year period of communication between Pappalardo and ISG[4] consisting of meetings, letters, emails and phone calls. Throughout, Pappalardo acknowledged that COB owed a fiduciary duty to ISG and the other investors, that the $4 million ISG had given to COB had been transferred to Henry Pearlberg of Swan Trust, and that Pearlberg had made subsequent transfers contrary to his agreement with COB. Pappalardo portrayed his clients as victims of Pearlberg and the other transferees, and promised that they would honor their fiduciary duties to ISG and the other investors by recovering the $19 million transferred to Pearlberg. ISG agreed to forbear from action against COB, its employees and the third party transferees, reasonably believing that Pappalardo would protect its interests, and that presenting a united front under the umbrella of Pappalardo, a respected former prosecutor, would maximize the chance of success. From this point forward, Pappalardo's actions tolled the statute of limitations with respect to COB and its senior executives, including Heffernan.

### H. *Pappalardo undertakes recovery of funds for the investors*

Pappalardo undertook to investigate the facts surrounding the transfers and recover the funds so they could be returned to ISG and the other investors. At the same time, he analyzed whether COB might have legal claims against May Davis and others,

---

[4] The communication with ISG was primarily to Philip Clark, and Christopher Barber, a director of ISG.

and told ISG he would commence litigation if the funds were not recovered by consensual means.

On October 6, 1999 COB senior executives wrote to ISG cautioning that the recovery process could be jeopardized if ISG or another party failed to maintain strict confidentiality. (ISG 169). The purported need for confidentiality was stressed again and again, both by COB employees and by Pappalardo in communications with ISG. On October 22, 1999 Pappalardo again wrote to ISG about the efforts to recover the funds that had been transferred to Swan Trust. Pappalardo explained "I am reluctant to share specifics of the details or process, for fear of jeopardizing the sensitive arrangements involved or breaching specific confidentiality agreements that are integral to the matters involved." He continued "[t]o also protect your interest and as part of pursuing our position for collection, COB has been preparing its own civil fraud case against the US based parties." (ISG 46).

From 1999 through October 2001, as more specifically described below, Pappalardo continued to assure ISG that he was protecting ISG's interests, and that he would bring claims if funds could not be recovered consensually. Pappalardo begged off from sharing detailed information by claiming it was sensitive, and reminding ISG to keep whatever it did learn confidential. ISG reasonably relied on Pappalardo throughout this time, and adhered to his instruction to keep things quiet.

### I.    *Employee promissory notes*

In February 2000 Heffernan and other certain senior COB executives received promissory notes from COB promising payment of $500,000 upon receipt of funds from Swan Trust.   At this point, the employees became self-interested in a recovery from Swan, and any vestige of a duty to the investors was eclipsed by their own hopes of a personal windfall became paramount.

### J.    *COB engages a recovery specialist*

In or about early 2000 COB hired a recovery specialist. Pappalardo invited Clark to meet with him and Alex Vladimir Budnitsky ("Budnitsky"), one of the consultants hired by COB.  (ISG 853).  After the meeting, Pappalardo followed up by sharing Budnitsky's "action plan" with ISG.  According to the "action plan," COB and the investors, including ISG, were to act as one "team" and Pappalardo was to represent the team.  (Ex. 51).

A month later, by letter dated June 22, 2000, Pappalardo suggested another meeting among himself, ISG, Budnitsky and Budnitsky's associate, Moshe Dayani ("Dayani").  (ISG 1217).  ISG reasonably relied on Pappalardo, believing that he represented COB, ISG and other investors on the team.

### K.    *Pappalardo requests a power of attorney*

In or about July 2000 Pappalardo asked ISG to give him a power of attorney.  He faxed ISG a draft document by which ISG and the other investors would give Pappalardo

11

power of attorney. The draft recites that COB placed a total of $19 million with Swan Trust, which total was comprised of the funds of ISG, Danstrupland and P.R.C.S., and that COB thereafter had hired the recovery specialists to identify and recover the funds. (ISG 52). On July 10, 2000, Pappalardo emailed ISG and said that documentation for the recovery was complete and ready to be presented to the banks. (Ex. 53). The following day, Pappalardo sent a letter in which he described the power of attorney as authorizing him to collect funds and put them into an escrow account at his law firm, and then disburse them to ISG minus a collection fee.

ISG executed and returned the power of attorney as Pappalardo had requested, along with a letter stating that ISG was granting him the power of attorney upon the understanding that he would exercise the utmost good faith and due care with regard to the interests of ISG, and communicate with ISG fully and on a timely basis. (ISG 54, 55).[5] By virtue of the power of attorney and side letter, ISG reasonably understood that Pappalardo was acting on its behalf to protect its interests. Pappalardo never told ISG that a conflict of interest might be created by his taking a power from ISG or that ISG might have its own claims against COB, Pomeroy or other senior executives.

**L.     *Pappalardo continues to act for ISG***

Throughout this period, ISG and Pappalardo continued to discuss his law firm's research on possible claims against May Davis. Pappalardo represented that a memorandum had been prepared, and after he made one final change, he would share it with ISG. (ISG 56).

---

[5] It should be noted that the power of attorney is still extant and has not been revoked.

On August 24, 2000 Pappalardo sent ISG an email. He said that he had executed Budnitsky's "action plan" by sending the power of attorney to Abn Amro Bank in New York, and that he assumed ISG was communicating directly with Budnitsky or Dayani. (ISG 57). Again on September 29, 2000 Pappalardo emailed ISG stating that Budnitsky or Dayani or both should call ISG directly with an update on the status of the funds. (ISG 58).

From mid-2000 through 2001, COB dissuaded ISG from undertaking any of its own efforts to recover its funds, stating repeatedly, through its own employees and through counsel, including Pappalardo, that it was, in essence, doing everything feasible to recover the funds. COB and Pappalardo cautioned that if ISG took any action, it would interfere with COB's ability to recover on behalf of the investors. ISG reasonably relied on COB and Pappalardo and, accordingly, acceded to their instructions to let Pappalardo handle the matter.

In late November or early December 2000, Pappalardo met with British and American attorneys representing First Merchant Bank OSH Ltd. He emailed ISG about these meetings and said that he had received "substantial documentation" regarding the improper transfers. (Ex. 59). Pappalardo elaborated further by letter on February 22, 2001, reaffirming that he had met with First Merchant Bank's attorneys and chairman, and stated that he had just received additional files from the attorney. He reassured ISG that if funds were recovered, they would be paid forthwith, consistent with COB's fiduciary duty to ISG. Finally, he added that COB was reviewing possible legal claims against individuals and investors.