UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 JUN -9 P 4: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

INTERNATIONAL STRATEGIES GROUP, LTD.
Plaintiff

v.

CIVIL ACTION NO.
04-CV-10863-RWZ

STEPHEN C. HEFFERNAN
Defendant

## AFFIDAVIT OF PHILIP CLARK

I, Philip P. Clark, being duly sworn, hereby depose and say:

1. I am over the age of eighteen, and believe in the obligations of an oath.

2. I make this affidavit in support of plaintiff's Opposition to Defendant Stephen C. Heffernan's Motion to Dismiss.

3. I reside at 16B, Hoi Kung Court, 264 Gloucester Road, Causeway Bay, Hong Kong.

4. I am an attorney and a representative of International Strategies Group, Ltd. ("ISG"), plaintiff in this action.

5. In my capacity as a director, and an attorney for ISG, I have been involved since 1998 with the matter of ISG's $4 million investment with Corporation of the BankHouse, Inc. ("COB") and James F. Pomeroy.

6. In early 1998 ISG became aware of an investment program with COB in which it was promised that funds would be held out of circulation in a blocked account in order to reduce worldwide inflation. The program was said to be approved by the Federal Reserve Bank. ISG's due diligence on COB included a Dun & Bradstreet report which listed securities licenses. I did not know it at the time, but Stephen Heffernan, COB's treasurer and chief financial officer, held securities licenses.

7. In April and May 1998, COB represented that ISG's investment would be held in a sub-account at Abn Amro Bank in Brussels pursuant to a bank guaranty of non-depletion, and that any movement of funds would require two signatures, one of them a representative of ISG. Based on these and other representations, ISG made its investment of $4 million.

8. In May 1998, COB requested ISG's consent to moving the funds from the sub-account to the COB master account at Abn Amro Bank in Brussels. In that connection, COB represented that this was simply an internal movement of funds, and would not affect COB's earlier undertakings.

9. ISG agreed to allow the funds to be moved on the basis of that representation, together with the fact that ISG understood, from the chain of documents it saw, that Mr. Pomeroy and Mr. Heffernan, COB's treasurer and Chief Financial Officer were aware of and approved the transfer.

10. Immediately after ISG's funds were transferred to the master account, COB wired substantial amounts to its lawyers at Eckert, Seamans, Cherin & Mellot, and to another COB account at Fleet Bank. ISG did not know of these transfers at the time, and never consented to them.

11. ISG began asking for the bank guaranty of non-depletion, and other assurances that ISG's funds were intact. On or about August 12, 1998, COB represented to ISG that ISG's profits were already $2 million. ISG believed this representation and relied on it.

12. On or about October 16, 1998 I spoke with Mr. Heffernan, seeking to have $1 million of the profit COB had previously represented it was holding in ISG's account wired to ISG's bank. COB wired approximately $1 million to ISG, and I believed it to be profit that had been earned.

13. In November 1998, I had meetings with Mr. Pomeroy and other COB employees regarding ISG's investment. Other employees who attended some of the meetings

included Mr. Heffernan, and Mr. Peter Ness, a lawyer who acted as an in-house attorney and also held the title of Vice-President—Corporate Finance.

14. COB, acting through Mr. Pomeroy and others, including Heffernan made various representations at the November 1998 meetings and thereafter, all to reassure ISG that its investment was safe. For instance, COB assured me that COB had custody of ISG's investment and showed me a document purporting to be an account statement to evidence its safekeeping. Also, COB assured me that ISG's investment would be transferred from Abn Amro Bank in Brussels to Fleet Bank in Boston and held in a separate account for ISG's syndicate. I agreed to this change in banks, and signed new account forms upon the understanding that my signature would be required for all transactions. I did not know it at the time but COB never funded an account at Fleet in ISG's name with more than $50.

15. On November 11, 1998 ISG wrote to Barbara Kravitz, corporate secretary of COB, asking for confirmation that the steps I had agreed to during my meetings had been carried out. Mr. Heffernan responded, saying that he would assemble the information and provide it expeditiously. ISG relied on that statement, but he never did as promised.

16. Although I did not know it at the time, COB, Pomeroy and Heffernan used another syndicate's funds to "replace" ISG's depleted account. Those funds were

allocated to ISG and transferred to Swan Trust, together with the funds of Danstrupland and P.R.C.S., for a total of $19 million.

17. At the time COB transferred ISG's and other investor's funds to Swan Trust, I did not know about Swan Trust or its arrangement with COB. The transfer of ISG's funds was done without ISG's knowledge or consent.

18. After I learned of Swan Trust and the fact that COB had transferred ISG's funds, Mr. Pomeroy assured me that transferring the funds to Swan Trust was a wise investment decision and would take advantage of a very favorable and unique opportunity. Given what I understood to be Mr. Pomeroy's and COB's investment expertise, I believed this representation and relied on it.

19. Mr. Pomeroy assured me that ISG's funds were intact and had not been depleted. I believed this representation and relied on it.

20. Nonetheless, there was a delay in disbursing funds. Mr. Pomeroy assured ISG that he was working to get the funds, plus profit, back from Swan Trust. Mr. Pomeroy also assured ISG that the accounts which included ISG's funds and profits had very large balances, totaling $100 million, with $46 million of profit, and that those amounts were to be distributed among ISG and two other investors.

21. In April 1999 Mr. Pomeroy represented to ISG that Swan Trust had assigned its rights to certain bank accounts and other assets to Pomeroy for distribution to investors. On or about July 26, 1999 Abn Amro transferred $1,215,000 to Mr. Pomeroy pursuant to the assignment from Swan Trust. ISG pressed Mr. Pomeroy to state the amount ISG would receive. Mr. Pomeroy responded that he would not give a formula, but that the amounts received would be used to protect the total position of the investment for everyone's benefit. ISG believed this representation and relied on it.

22. In August 1999 Pomeroy asked me to meet with A. John Pappalardo, whom Pomeroy introduced as a lawyer representing COB and Mr. Pomeroy. Pappalardo immediately began corresponding with me directly and also corresponded directly with Christopher Barber, another director of ISG. Mr. Pappalardo set out to assure ISG that he would act to protect the interests of ISG and the other investors. Also, Mr. Pappalardo proceeded to convince me and Mr. Barber to forbear from any action against COB, its directors or employees, including Heffernan, in connection with the transfer; to portray his clients as victims; and to convince us that he would work on our behalf. He asked for our forbearance while he tried to recover the investments in COB. Mr. Pappalardo represented that the recovery process must remain "confidential" and emphasized the "need on our side to have mutually supportive positions."

23. At various times, commencing in August 1999 and continuing into 2001, Mr. Pappalardo acknowledged that COB owed a fiduciary duty to ISG and the other investors.

24. At various times, commencing in August 1999 and continuing until he informed us in March 2002 that he no longer represented COB, Mr. Pappalardo portrayed his clients and the investors both as victims of Henry Pearlberg, trustee of Swan Trust.

25. Mr. Pappalardo represented to us that he would undertake to investigate the facts surrounding the transfers and recover the $19 million which COB had transferred to Swan Trust so that it could be returned to ISG and the other investors and that he would "implement a strategy" for the return of our funds.

26. Mr. Pappalardo also said that to protect ISG's interests COB was preparing its own civil fraud action.

27. On June 1, 2000 Mr. Pappalardo sent me an action plan prepared by recovery specialists retained by COB which described COB, ISG and the other investors as one team, and said that Mr. Pappalardo would be representing the "team." Pappalardo represented that he would follow the action plan to recover the investment and sought our comments so that "we can begin implementation."

7

28. Mr. Pappalardo arranged for ISG to meet with the recovery specialists, and to correspond with them in order to stay abreast of developments and professed, from time to time, from August 1999 through late 2001 to provide "updates" of his progress in recovering the funds on behalf of the "team."

29. Mr. Pappalardo further promised ISG that he would commence litigation against third parties if the funds were not recovered.

30. Mr. Pappalardo also promised to send ISG his research memo on possible legal claims against May Davis.

31. By virtue of Mr. Pappalardo's acknowledgement that his clients owed ISG a fiduciary duty, by virtue of his undertaking to investigate the facts and recover the funds, by virtue of his description of his clients as victims of Henry Pearlberg, by virtue of his undertaking to send ISG the research memo on causes of action against May Davis Group and to commence litigation against third parties if necessary, and by virtue of his endorsement of the action plan under which he was to represent the "team" of COB and the investors, ISG believed that Mr. Pappalardo was acting on its behalf, to protect its interests. It should also be noted that Mr. Pappalardo held himself out as an expert in these matters. I knew that Mr. Pappalardo was a former prosecutor, and he said that his contacts with the authorities made him a good candidate for representing the team and

recovering the funds. At no time did Mr. Pappalardo suggest there was any conflict of interest or that we should seek separate counsel.

32. Pappalardo further induced ISG's reliance on him and forbearance from initiating action against Pappalardo or others affiliated with COB, by causing ISG to execute a power of attorney in his favor. On or about July 10, 2000 Mr. Pappalardo sent ISG a draft of a power of attorney which would give him power of attorney to act on ISG's behalf, to collect funds on ISG's behalf and put them into an escrow account at his law firm. According to the power of attorney, the funds were to be disbursed to ISG, minus a collection fee.

33. ISG executed the power of attorney as requested, along with a letter stating that ISG was granting the power of attorney upon the understanding that Mr. Pappalardo would exercise the utmost good faith and due care with regard to the interests of ISG, and communicate with ISG fully and on a timely basis. Mr. Pappalardo did not contradict that he had the obligation to act with utmost good faith and due care and that he, as counsel to COB, Pomeroy and others associated with COB owed a fiduciary duty to ISG as well as to his primary clients.

34. By virtue of the power of attorney and the letter described in the foregoing paragraph, in addition to other factors recited above, ISG understood that Mr. Pappalardo was acting on its behalf, to protect its interests. ISG relied on Mr.

Pappalardo to do what was necessary to recover the funds, according to his professional judgment.

35. In August 2000, Mr. Pappalardo told ISG that he was executing the action plan by sending the power of attorney to Abn Amro Bank in New York, where First Merchant Bank had an account. It was believed that Swan Trust had transferred ISG's and the other investors' funds to that account.

36. From mid-2000 through 2001, COB dissuaded ISG from undertaking any of its own efforts to recover its funds. COB, through its employees and Mr. Pappalardo, said, in essence, that it was doing everything feasible to recover the funds, and that if ISG took any action, that would interfere with COB's ability to recover on behalf of the investors, and that recovery efforts had to be kept confidential. ISG acceded to that instruction and relied on Mr. Pappalardo to do what was necessary to recover the funds, given his acknowledgment of his obligations to ISG as well as COB, and his continued portrayal of COB and its employees as victims.

37. At various times in 2000 and 2001, Mr. Pappalardo told ISG about meetings with First Merchant Bank, and with Henry Pearlberg, and others. He said he had collected substantial documentation regarding the improper transfers, and it would be valuable for litigation.

10

38. Mr. Pappalardo reassured ISG that Mr. Pearlberg had provided his entire file on Swan Trust's dealings with Joan Patrick, that the recovery specialists were working to recover the funds, and that if the funds were recovered, they would be paid forthwith, consistent with COB's fiduciary duty to ISG. Mr. Pappalardo opined that it was reasonable to conclude that positive developments could result in the return of monies. Mr. Pappalardo also said that COB was reviewing possible legal claims against individuals and investors.

39. ISG continued to believe that Mr. Pappalardo was acting on its behalf, to protect its interests. ISG relied on Mr. Pappalardo to do what was necessary to recover the funds, according to his professional judgment.

40. On August 15, 2001, ISG wrote to Mr. Pappalardo to ask for an update and to press for a meeting with Henry Pearlberg during the first week of September 2001. ISG was frustrated with Mr. Pappalardo's lack of responsiveness, but said in the letter "we don't wish to harm the relationship with you." In response, Peter Ness, COB's vice president and in-house lawyer, and liaison to Mr. Pappalardo, told ISG that it was proceeding with the first steps of litigation. A week later Mr. Pappalardo emailed that Henry Pearlberg would meet in September. Mr. Pappalardo emailed again on September 28, 2001 and October 2, 2001.

41. Based on these communications with Mr. Pappalardo, which took place every two or three months, Pappalardo was acting on ISG's behalf, to protect its interests.

ISG relied on Mr. Pappalardo to do what was necessary to recover the funds, according to his professional judgment.

42. Based upon these communications and others with Messrs. Pappalardo, Ness and others acting on behalf of COB, ISG and I continued to believe that Mr. Pappalardo was acting on ISG's behalf, to protect its interests, that our investment would be recovered, and COB was a "victim" as was ISG. At no time did Messrs. Pappalardo, Ness or anyone else at COB suggest there was any conflict of interest or that anyone affiliated with COB did anything wrong, including Mr. Heffernan. ISG and I relied on Mr. Pappalardo to do what was necessary to recover the funds, according to his professional judgment.

43. Finally, after no restitution was forthcoming on a consensual basis and no litigation had been commenced (contrary to the representations of Mr. Ness in August), I consulted with a lawyer on behalf of ISG in late October 2001.

44. After retaining Kathleen Stone as counsel, Ms. Stone sought to obtain documents from Mr. Pappalardo to learn the identities of potential defendants. She sought the documentation immediately by telephone, by e-mail and finally by letters dated January 4, January 25, and March 8, 2002 respectively. Finally, in March 2002, Pappalardo admitted that he no longer represented COB.

45. ISG commenced litigation against COB, Pomeroy and Societe BankHouse on March 22, 2002. Mr. Heffernan was subpoenaed for deposition. Through discovery in that case, ISG learned of Heffernan's active involvement in the fraud that led to the loss of its $4 million investment.

46. Specifically, ISG obtained tax returns and financial records showing COB's losses, how it carried ISG's investments on its books, how it transferred investors' funds to an account known as an "L&E" account (meaning Loan and Exchange) out of which COB made payments to Mr. Pomeroy, other entities controlled by Mr. Pomeroy, and certain creditors such as its lawyers. From these documents, ISG learned of Mr. Heffernan's involvement in the events relating to ISG's investment, preparation of tax returns, maintenance of financial records, transfers to and from the "Loan and Exchange" account, and other matters demonstrating his conspiracy with COB and Mr. Pomeroy and his aid to them in carrying out fraud on investors.

Signed under the pains and penalties of perjury this ___ day of June 2004.

_____
Philip Clark

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY THAT ON THIS DAY A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH PARTY BY MAIL/BY HAND/BY FAX.

DATED: 6-9-04    Kathleen C Stone